Thank you, Judge. May it please the Court, I'm Michael Avakian, attorney for Pellant Four-C-Aire, and I'd like to reserve five minutes of my time for rebuttal. And since I have the entire panel from the previous case, I'm going to omit some factual background remarks because I think you have some familiarity already with the matter. This case considers whether the undisputed facts in the record establish Four-C-Aire must pay an exit contribution to the pension fund. We believe there are three critical issues for resolution. One, whether settled contract law allows other documents not identified or referenced in a signed document to be incorporated, whether the wage sheet contains terms commonly found in the two pre-hire agreements that adopt CBAs by conduct, and whether the exit contribution is established consistent with the requirements of Pellant Four-C-Aire. On appeal, of course, this Court's determination below is looked at for error and all inferences in favor of Pellant Four-C-Aire. On this developed record, the Court has no- Counsel, let me ask you a couple of preliminary questions. Sure. Fraud in the execution of the agreement appears to be an exception to the general rule that you could raise as an affirmative defense. I think that you've argued that, but the district court ruled that it wasn't raised below and therefore that's waived. Is that a position that you're advancing today, that you're entitled to raise the fraud in the execution of the agreement argument? There's two parts to that, Your Honor. The answer is yes, but that's not the grounds for our appeal of the district court's decision. We believe we were surprised by the claim that the wage sheet was a signature page, and that occurred first in a deposition of a 30B6 witness, which was well after the case was remanded from this Court back to the district court. And second question, which kind of leaps ahead probably of where you were going, but the one way to look at the wage sheet and the other agreements is, did your client sign off on them? And obviously the only thing they signed was the wage sheet, but when they were terminating their relationship with the union, one or two of the letters also said, well, we're terminating our relationship with the Contractors Association. So if we determined, for instance, that the wage sheet was a standalone document and did not incorporate the other agreements, if your client was a member from the beginning of the Contractors Association and the terms of its relationship with the Contractors Association would have embraced these other agreements, then that might be a basis for the fund to claim that you were bound by all of them. But that's a long way around the barn to say the only evidence I see of your relationship with the Association and the record is in the letter saying, well, we're going to withdraw. Is there any other evidence in the record that establishes Fourcier's relationship with the Contractors Association? Your Honor, no, there is no other evidence. The depositions indicate they were not members of the Association. They were providing notice to the Association, not that they were a member, because they were told to do that. Thank you. Didn't mean to interfere with your train of thought. Let me just ask you on that. I have the letter in front of you here and it says, when our contract, this is to the Association, when our contract expires on April 30, we will not renew. We have notified the Union of our decisions to withdraw from the Association at the end of our contracts. So what's he saying when he says, I want to withdraw from the Association if he wasn't already a member of the Association? He was repeating the demand of, I shouldn't say demand, the outline of how the Union believed that Fourcier should withdraw, which is to utilize a specified termination provision in the contract and notify the Association. So he did all those three things in consonance with the request that the business manager of the Local 58 requested of him to do. Why would he have to do that if he didn't feel bound by the agreement? I agree with you, Your Honor. There's maybe a slight disconnect there because it's not necessary to go through all those hoops to notify a union of contract repudiation. But in this case, he went about and notified everybody that he could that he was going to terminate the wait sheet agreement that he utilized on April 30. Even his first letter that he didn't send, where before the Union gave him advice, he said, we're opting not to renew our contract agreements. He wrote that letter on his own. And they wrote back and said, you can't just do that. You have to give the notice and so forth. And so he gave the 150-day notice. And in the 150-day notice, he starts referring to specific time periods of the contracts. These letters aren't that innocent, I don't think. Don't we have to hold them to those? Well, I don't think so, Your Honor. He's articulating an attempt to get out from under at least his wait sheet. I mean, that's what he's referring to. He didn't talk about a wait sheet. He talked about the plural. He talked about our contract. And he talked about agreements in the plural. And he wrote two letters, two separate letters. Right. There's some inconsistency in that, Your Honor. But the intent is to terminate. And that was the reason he was doing that. The record shows the four-year principles clearly were operating solely under the wait sheet and had no notice of the other documents until the summer of were provided to it. But I don't think, for purposes of how clear a writing of an individual that did not have counsel to write a deliberate letter that would have been carefully crafted in the situation should be held against them for this particular purpose. Not held against them, but he sort of says, he sort of seems, or maybe it's your brief, but he seems to want to play dumb and saying, I just agreed to charge some wages at a level so that I can get some pension benefits. That's really where he comes out. We went up to Syracuse and talk about it, and they gave me the wait sheet. And that's all it was about. But he went up there knowing that he had to join the union to get those benefits. And they were, did come back, and every member in the plant, whether they're eight people or something, all joined the union. This is a, how much more does he, he knows all these contracts, the CBAs are there. He gets some assistance from the union, not a lot, but he takes advantage of a few of the benefits that the union provides. Well, I disagree, your honor. He was certainly an unsophisticated person that went and signed the wait sheet, because that's what he got when he went down to Syracuse, as you indicated. And that's what he did. What's he talking about when he talks about he's terminating contracts? He clearly intended to terminate contracts, and he did it on his own before the union gave him his repudiation notice applies to whatever is out there. Contract agreements as a wait sheet, that's what you argue? Right. That's right, your honor. Because he had no knowledge of the other documents when he signed up, when he signed the wait sheet. And that's an important factual part of the development here. But in terms of what we find with the mechanism that the district court employed to hold Forcier liable, we will look at normal contract law as the Supreme Court has outlined in cases such as M&G Polymers v. Tackett and C&H v. Reese. But to get there, we need to understand how the exit contribution was developed and what was open for exploration and discovery by the court's remand back to the district court. It was clearly premature from the court's determination, it was premature for the district court at that time on the motion to dismiss to find incorporation by reference into the wait sheet, or incorporation by reference at all, and illusory contracts was not appropriate at that pleading stage. And also that the ability of the amendment process to add the post-expiration exit contribution was something that could be explored and developed further in the case. Nothing in the standard form, for instance, expresses any intent to bind an employer, for instance, to every term of a trust agreement or to make post-contract payments. And that's, there's case law that we've cited. As I understand your position at this, and we're at grant of summary judgment, correct? Correct. Yes, your honor. Right. Your client's position, as I understand it, is that this is the district court resolved factual disputes, which it can't do at this stage. And one of those factual disputes is your clients say, we signed the wait sheet, that was it. We don't know anything about these other documents. Is that correct? That's right, your honor. So if that's yet to be resolved with fact finding, what may be in these other documents, if your client's position is, we don't know them, is that relevant to your argument today? Well, actually not, your honor. You understand my question? I think so. I think, if I can restate what you're saying, you're asking whether our knowledge of what may be in some other agreements, such as a standard form, may create obligations on my client. And I don't think that's the case. When we look at the wait sheet, which is the only document signed here, it uses the terms, and we may disagree, it uses the term merely a wait sheet. And merely has clear definitions and legal definitions and ones that are used in general English grammar. And that means it's solely what it says it is. The district court indicated that the word merely meant it was a part of something else, which is not the normal usage and not the set forth in our brief. The actual terms are, this is merely a wage infringe rate sheet furnished to all employers for immediate guidance. The new contract and its addenda will be forward to you as soon as it is available. And we know from cases such as 32BJ North Pension from the second circuit. How do you interpret that? I interpret that just commonly. It says this is merely the part of the big contract, which you'll get later. This is merely or only the wage portion of the contract. I disagree, your honor. And for two reasons. One is the language of the document itself says the new contract and its agenda will be forward to you as soon as it is available, meaning it's not available. Secondly, the record evidence indicates that the new contract that is referred to in here is another wage sheet, not another standard form or addenda, which may be read into it. And so if that's an issue of fact, then that should not have been resolved at this stage. Well, I thought these two sentences were making a distinction between a rate, a sheet, a wage sheet and a new contract. In other words, they use two different terms. So it looks to me like the wage sheet was anticipated to be a portion of the whole contract, which we'll send you as soon as it's available. It doesn't exclude the fact that it's already there's an existing contract. Well, it's certainly saying that the new contract will be forwarded when it's when it's available. But that is not does not bind force here to a current contract that is it's that is alleged to exist such as a standard form. Is it your position that whatever the contract is that's referred to in that language? That is that is it your position, your clients never got that, whatever it is? That's correct. They didn't get it until about three months before they sent the notice of repudiation. So it was the following year. Can I ask a question which is related to what Judge Niemeyer was getting at earlier? And let's assume for the moment that, you know, you've made a good argument about the MeToo agreement and the factual disputes that are that are in the record or may exist in record as to whether or not they actually expressly signed a contract. But Judge Niemeyer's point was that they're all there's all manner of conduct here, which suggests a ratification of the agreement, even if not expressly assented to in writing. One is the manner in which they terminated the agreement. That is that they, you know, they abided by the conditions by which someone would have to get out of the CBA. And but then there's the fact that for two years, they in fact paid benefits or contributed to the pension plan over a course of two years, that at least one employee actually has vested and is receiving benefits under the plan, that there was an apprenticeship program that that employee participated in pursuant to the plan, that the company complied with a payroll audit that was required under the terms of the agreement. And the district court cited a number of these things that it said supported the notion of ratification by conduct. And we have a case, plumbing services, that says that that that is another method by which an employer can agree to sign on to a collective bargaining agreement. So why isn't that alone sufficient to suggest affirmance in this case? Right. Let me take it in almost reverse order. In the plumbing services case, that was a withdrawal liability case. That was a case not brought directly under 515, which is the operative section here under ERISA, that the case is being brought against Forcieron. Rather, it was simply utilizing the multi-employer withdrawal liability piece. And that's the basis upon which the adoption by conduct was applied, not in the circumstances that we find here. And that's irrelevant to the holding in that case. The holding in that case was that the conduct created the obligation without the signature. And in this case, not do only do we have the list of things that Judge Diaz just asked you about, but we also have those letters. Those letters may not be contracts, but they're indicative in furtherance of all the lists that Judge Diaz pointed out. And I, it may be that the services, are they or not? I don't think so. There is no evidence of, that's another issue because it's a factual one, which is whether there was any effort of Forcier to comply with the contract. They certainly made erratic contributions because there was no time in the wait sheet for, or for upon which payments were to be made to the trust fund. And that's what got them in a bunch of trouble with the trust fund to begin with, because they never knew about all the requirements that the trust fund had. As your honor, I'm at, I have a couple other arguments off to rely upon my brief for, for them. And you have some rebuttal too. Yeah. I'm, I'm writing into my rebuttal time at this point. Okay. Thank you, your honor. Yes, sir. Ms. Barty's morning, your honors may please the court. I'm going to address a number of the concerns that you just raised with Mr. Avakian, including your questions regarding the letters in this case. But first, I want to start by addressing where we are in this case. In the first appeal, this court laid out a roadmap for basically four steps for the pension fund to succeed on its claim. And those factors were first that Forcier had to be bound by the collective bargaining agreement and thereby bound by the trust document. Second, that Forcier, second, that the trust document provided that participating employer was required to pay an exit contribution under certain circumstances. Third, that the trust document was further amended and clarified to make clear that that obligation survived the termination of the contract. And finally fourth, that Forcier failed to pay the exit contribution. Here, that fourth factor was not disputed before the district court. Forcier has not paid the exit contribution despite the circumstances arising requiring that this court was definitive in its holding that the trust document was incorporated into the CBA. And this court had before it the language of the collective bargaining agreement and it quoted it, finding that the parties agreed to make contributions and to be bound by any trust. We quoted that because that was what was recited. Yes, your honor. And that goes to the complaint. It was still a matter of documents in now, but it looks like to me that the first issue you raised is really where the crux of the appeal is here. It is, your honor. And on that count, the district court correctly determined that there were two independent bases for Forcier's liability. And that's that first it signed a Me Too agreement or in the alternative, as Judge Diaz was discussing, that Forcier was bound to the agreement by its conduct. Now, when we're talking about the collective bargaining agreement in this case, we're talking about an integrated three-part document. It's the standard form of union agreement, the addenda, and the wage infringement. In the prior opinion, again, we were just reciting what was in the complaint because at that stage, in effect, we had no evidence. So there are places in the district court's opinion in this second case where it appears to take some of our language in the prior cases if it were given as opposed to still subject to proof, which it would be at the summary judgment stage. So if we start with the wage sheet, which is the only document that Forcier signed, there have to be facts that that that agreement embraced all the others. And Forcier's position is, as I understand it, we signed the wage sheet and that's all there is. And that the district court made factual findings that it should not have made at the summary judgment stage. I don't believe that the district court made factual findings that it should have made. The facts that the district court relied on were undisputed. The discussion that you all had with Mr. Avakian at the start of his argument about whether or not they were a member of the Contractors Association, that fact, I think, is disputed. But ultimately, it's not a genuine issue that would have weighed one way or the other for summary judgment. Because what matters for the purpose of a MeToo agreement is that the employer didn't negotiate the contract for itself. And in this case, that is undisputed. Forcier did not negotiate this contract. That begs the question of, well, what's the contract? I mean, that's the fact to be proven. And Forcier says, we signed a wage sheet. That's the only thing we ever got. We never saw any of this, these other documents. And we never executed any document that would incorporate them in some way. I mean, that's their factual position. So it would appear that there is a disagreement of material fact on whether or not any of these other agreements were adopted by virtue of signing the wage sheet. I believe that the district court correctly looked at the wage sheet and the of the wage sheet, that it was a part of a greater whole. If this court doesn't agree, why is that? What are those facts? It is that the wage sheet provides that it's not a standalone document. And that the... Where does it say that? It's the language that was discussed in Mr. Avakian's argument regarding merely. As Judge Niemeyer noted, the district court correctly determined that the statement that it's merely immediate guidance for the contractors, the district court made a reasonable interpretation that that meant it was not a standalone document. If this court... The Forcier people say, well, whatever this new contract is, that doesn't bound us to whatever may have existed at that point. It would have been a new contract and we never got it. Now, they may be wrong, but it seems like to me that's another material disputed fact that could not be resolved at summary judgment. If that's how this court views this case, then... And if it disagreed with the district court's determination that the employer bound itself to the full agreement by conduct, then the appropriate remedy would be a remand on that dispute. We look at the case based on the facts. And so I'm asking you as counsel for the trust, what the facts are that leave it as undisputed to support your position. Because as long as there are material facts in dispute, regardless of how they might be resolved at trial, you can't grant summary judgment. Well, you wouldn't be able to grant summary judgment on this argument. But as the district court held, there was a separate independent basis for finding that Forcier was bound to the collective bargaining agreement. And that was by adopting the agreement by conduct. Here, there are various ways in which the employer acted with an intent to be bound by the contract as this court found the standard to be in plumbing services. They're not listed in the contract. For example, it complied with the pension funds request for an audit. It used the pension funds online system. Both of those are required in the addenda to the agreement. Forcier and its employees received health insurance and followed the rules necessary in order to do that. As Judge Diaz... Again, not to be the devil's advocate, but as I understand Forcier's argument, they say, well, we simply complied with the wage sheet when we did all those things because the pension fund shows up in two or three places on the wage sheet. And the fact that they may have used an online system instead of sending in a check, that's not inconsistent. It doesn't appear to me that that's inconsistent with the wage sheet as a standalone document. It may also be consistent with the other agreements, but unless there's something substantial that they did that was inconsistent with the wage sheet, that would still follow their argument in this case. The wage sheet is a summary of the benefits and the fringe rates and the wages that need to be complied with the wage sheet. But the factors that I'm listing are requirements of the full collective bargaining agreement that the employer also abided by. For instance, it abided by the contract 7 a.m. start time. It had one of its employees enrolled in the apprenticeship program and received training through that program. And I think the letters here are the best evidence. As this court noted, those letters show that this employer was abiding by the termination clause of the standard form of union agreement. And let me note the timing. The first letter it sent before it received the instruction from the union was sent in around November 20th of 2015. That was just before the 150 days was about to run. The 150 days would have run around December 1st. The timing shouldn't be lost here. Even before the union told the employer what to do, the employer knew that it had to take that action 150 days out. And then it listened to the union's instruction. It didn't say, we're not bound to the agreement, so we're not going to make those, we're not going to follow your instructions. It followed the instructions. It referenced that it was withdrawing from the employer's association and terminating its 4C-ER. 4C-ER says, as I understand it, we just wanted to get out and we would do whatever they told us to do so we could get out. At the time that it had the termination, the time it was sending those termination letters, I do want to point out that it's undisputed that 4C-ER had the full collective bargaining agreement, including the standard form and the agenda at that time. Those documents had been served on the company through the default action that had taken place earlier in 2015. I'll also point out that it received a letter from the union in December 2014 regarding the contract violation of the use of personal tools. And that document referenced, by name, the standard form of union agreement with a citation to the article. At no time during this period did 4C-ER say, we're not bound to this contract, or we don't know what you're talking about, we've never seen it. Instead, it manifested an intent to be bound by the contract through its conduct. We think that the district court was correct in that determination. And when you compare this case to plumbing services, I think that becomes apparent. Judge Niemeyer, I agree that this is a case where we have factors that are even greater than the factors considered by this court in plumbing services. One other note about that case is that the withdrawal liability in that case, the withdrawal liability statute states that delinquent withdrawal liability is collected under Section 515 of ERISA. So there is no distinction between that case and this case on that ground, as Mr. Avakian suggested. Additionally, this court noted that in plumbing services, the employer was belated in its It didn't say, we're not signatory to this until the withdrawal liability assessment came out. And that belated action is here as well. We have a case where an employer did not say, did not stand up and state, we're not signatory to this contract until the fund assessed the exit contribution here. As to Mr. Avakian's additional arguments, we don't believe that there is a Section 302 issue here. The collective bargaining agreement serves as the written basis for the contributions to be made, and that's whether or not signed by the employer. We also don't believe that there are any issues with regard to the trust documents in this case. The employer misquotes this court in both its opening brief and its reply brief, saying that this court left open for remand flaws in the pension funds trust documents. And that's simply not what this court said. This court said that the district court should not have dismissed the pension funds claim at that time based upon perceived flaws in the amendment process. Now, as this court stated in the first case, the amendment was ultimately irrelevant because the original trust document, the one that was in place at the time, Forcier either executed the agreement by signing the wage sheet or became bound to the collective bargaining agreement through conduct. That trust document at that time, before it was amended, already required the payment of the exit contribution. Finally, I think there's two issues in this case that are attempted to be re-litigated. The first is that this exit contribution is collectible under Section 515. I think this court was clear on that in the first case, and that should not be re-litigated here. And finally, the pension fund takes the position that there is no difference between contract repudiation and contract expiration, such that this court should come to any different conclusion than it did in the first case. And I think the best example for why that's an issue being re-litigated is the employer's reliance on M&G Polymers versus Tack-It for that argument, which this court already said was inapposite to these circumstances. For these reasons, your honors, unless you have additional questions, the pension fund believes that the district court correctly decided this case and found that there were two independent bases for the liability, whether it be the foreseer executed the agreement by conduct, or I'm sorry, whether foreseer executed the agreement by signing the wage infringe sheet, or whether it adopted it by conduct. And I do want to address one last issue, which is the fraud in the execution that you raised, Judge Agee, on Mr. Avakian's argument. I do want to note that the district court found both that it was waived, that the argument was waived, and second, looked at the merits and found that had not been factually developed and found on the merits in favor of the fund on that position. And I do want to note the surprise on the signature page. It doesn't matter what we're calling this agreement, a wage infringe sheet, a signature page, whatever it may be. At the end of the day, it's where employers sign this agreement. And so we do not believe that there was any surprise that would have prevented the employer from raising those issues more fully during discovery or through its answer. And for those reasons, we believe that the district court's decision should be upheld. All right. Thank you, Ms. Barty. Mr. Avakian? Hopefully you can hear me now. A lot of ground was just covered dealing with various issues. The most recent one that was dealing with the trust fund agreements. The court's decision, previous decision, allowed for the determination whether activities of the trust fund were taken in an appropriate manner. As we set forth in our briefs, none of the trust fund documents are signed. There's no indication that any trustee ever agreed to any changes in the trust fund to allow the exit contribution. And there's no signed signatures on the trust documents as they were developed through over 20 years of documents that we acquired. And the court has that information available to it. I do recognize that we have a situation dealing with those particular documents. Somehow my camera, I don't know, can you see me? Yes, you're okay. Okay. Okay. Mine went out, but that's all right. I'll continue to talk. We can see you and we can hear you. I just can't see you, so I'll just have to remember. I'm sorry. With regard to the establishment of trust, I think that's an important point because if they can't authenticate their documents, then it's a difficult situation in which to find that there's going to be any liability. But I think one of the more important parts is what was the agreement in terms of whether it was considered to be something that, whether the collective bargaining agreement as the court understood the allegations represented in the first case by the trust fund really did pan out in the way the discovery unfolded. As we were just talking about the signature page, it's clear that that issue was never raised to this court as to what the composition of the documents might have been. In fact, there's clear recognition that what the court had before and was considering was only the pleadings of the trust fund and not the actual documents because they never provided the documents to the district court and those documents were never provided in the record to this court. So, as the court has indicated, it would have been difficult or impossible for it to rule precisely on the language and make a clear determination of the law on the specific facts as they occurred here. Now, M&G polymers and CNH are important because in the determination at this stage of the case where we have a developed record, the court has to apply the law to the facts. And in this particular case, the district court did not apply any law to dealing with incorporation by reference to Forcier's weight sheet, which if it had, it would have been almost impossible to decide that it became a document attached to another document because on the four corners of the document itself. And that leads to the question of the fairness of what's taking place here and that we should not lose fact of the situation that the trust fund is trying to obtain a document or obtain relief and benefits that were not presented to it through the collective bargaining agreement. They are overstating the power of the standard form to give them complete control over the operations of an employer. And as the First Circuit indicated and stated in a very similar case of Manchester Knitting, a situation where a health and welfare fund developed a withdrawal liability provision in its own trust, that assessment and acquisition of unlimited power to impose financial obligations on an employer were illusory and unreasonable in the circumstances. In fact, the business manager of Local 58 who signed the standard form agreement and wrote and signed the addenda to agreement and signed the weight sheet agreed that the trust fund could not impose additional contributions on employers, unions, or employees. It was beyond the scope of the power that was delegated. There is certainly a significant question of fact of whether the trust fund could do so and if the court were to grant the fund's request to allow it to impose these types of exit contributions without knowledge and notice to the employer community that they were doing so, it would really wreak havoc on what's happening nationwide and as a result also create a multi-circuit conflict. I believe that type of decision to uphold this type of exit contribution in the circumstances would conflict with the First Circuit's decision in Manchester Knitting and the Second Circuit's 32BJ North Pension. Finally, with regard to 302 of the Labor Act. You have to go quickly because the red light is on. Oh, is it? Take a minute to do the last thing there. Okay, I just wanted to say that in the circumstances of 302, the expectation in the statute is that the contributions that are going to be allowed to go into a trust fund by the LMRA statute is for the sole and exclusive benefit of the employees of such employer and their families and dependents. Once those contributions are laid into the fund or assessed into the fund that way, then the fund can use those monies collectively for purposes of other uses. If the trust fund is allowed to create situations where it can take money from employers for other reasons beyond those that are set forth in 302C5, then the opportunity for fraud and for racketeering, which were the impetus for the statute, would occur. I would conclude by saying that the Seventh Circuit in Massey v. Rockaround Trucking in 2001 stated that 302C5 does not allow an employer to contribute to employees of the contributing employer. For these reasons, Your Honor, we believe the district court's decision should be reversed and if the court deems necessary to remand for trial on the material facts, including whether the standard form and addenda are incorporated in the wait sheet. Thank you, and if you have any other questions. Thank you, Mr. Rake. We appreciate your arguments. Our practice would be to come down and shake hands with you, and I don't want you to forget that's our practice. We're proud of it. We've been doing it since the 1930s, and only because of COVID have we had to avoid it, but we thank you for your arguments, and that's what we would normally say to you when we shake your hands, so thank you very much.
judges: Paul V. Niemeyer, G. Steven Agee, Albert Diaz